United States Courts
Southern District of Texas
FILED

MAR 2 8 2011

David J. Bradley, Clerk of Court

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HESTON EMERGENCY HOUSING, LP and NAJI AL-FOUZAN | § § § § | |
| VS. | § § § | CIVIL ACTION NO. H-11-1121 |
| TEXAS DEPARTMENT OF HOUSING and COMMUNITY AFFAIRS, MICHAEL GERBER, MARTIN RIVERA, JR., MARISA CALLAN, and TIMOTHY IRVINE | § § § § § | JURY DEMANDED |

**COMPLAINT AND JURY DEMAND**

Heston Emergency Housing, LP headquartered at offices located at 1025 Bienville Street, Suite 8, in the City of New Orleans, Parish of Orleans and State of Louisiana, and Naji Al-Fouzan with a business address of 1025 Bienville Street, Suite 8, in the City of New Orleans, Parish of Orleans and State of Louisiana, by way of Complaint against the Defendants, each of them and all of them, jointly and severally, say as follows:

**JURISDICTION AND VENUE**

1. Jurisdiction of this Court arises under 28 U.S.C. § 1331 as claims in this matter arise under the laws of the United States.

2. Jurisdiction of this Court over the supplemental state claims arises under 28 U.S.C. § 1367(a).

3. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1332 in that a substantial part of the events or omissions giving rise to the causes of action herein occurred in the State of Texas, particularly in the cities of Austin and Houston.

**PARTIES**

4. At all times material to the within causes of action, Heston Emergency Housing, LP ("HESTON") was a limited partnership headquartered at offices located at 1025 Bienville Street, Suite 8, in the City of New Orleans, Parish of Orleans and State of Louisiana.

1

5.      HESTON's general partner was, at all times relevant to this action, HESTON, LLC.

6.      HESTON's limited partner was plaintiff NAJI AL-FOUZAN ("AL-FOUZAN"), with a business address at 1025 Bienville Street, Suite 8, in the City of New Orleans, Parish of Orleans and State of Louisiana. For ease of reference HESTON and AL-FOUZAN will be hereafter jointly identified as HESTON.

7.      At all times material to the within causes of action Texas Department of Housing and Community Affairs ("TDHCA") was an executive agency of the State of Texas headquartered at 221 East 11th, Post Office Box 13941, Austin, Texas 78711-3941. TDHCA is to be served at its headquartered address of 221 East 11th, Austin, Texas 78711-3941.

8.      At all times material to the within causes of action, defendant Michael Gerber was the Executive Director of the Texas Department of Housing and Community Affairs. Mr. Gerber is to be served at his business address of 221 East 11th, Austin, Texas 78711-3941.

9.      At all times material to the within causes of action, defendant Martin Rivera Jr. was MK an employee, agent and servant of the Texas Department of Housing and Community Affairs with the title of Contract Administration Coordinator, Disaster Recovery Division. Mr. Rivera is to be served at his business address of 221 East 11th, Austin, Texas 78711-3941.

10.     At all times material to the within causes of action, defendant Marisa Callan was an employee, agent and servant of the Texas Department of Housing and Community Affairs who was the Project Manager for the Texas Alternative Housing Pilot Program. Ms. Callan is to be served at her business address of 221 East 11th, Austin, Texas 78711-3941.

11.     At all times from January 2009 forward to present, defendant Timothy Irvine was an employee, agent and servant of the Texas Department of Housing and Community Affairs with the title of Chief of Staff. Mr. Irvine is to be served at his business address of 221 East 11th, Austin, Texas 78711-3941.

## COMMON FACTUAL ALLEGATIONS

12.     Following the 2005 hurricane season, in which a great deal of damage was done to the Gulf Coast region of the United States, the Federal Emergency Management Agency ("FEMA") perceived a need to investigate alternative forms of emergency housing for persons displaced by events such as hurricanes.

13.     Accordingly, in 2006 Congress appropriated approximately $400 million to the Alternative Housing Pilot Program ("AHPP"), designed as a grant program to address housing needs.

14.     FEMA developed the AHPP as a competitive grant program and invited the Gulf Coast States to submit innovative proposals.

15.     The aforementioned proposals were to be made by relevant state agencies, which would be the grantees under the AHPP, as defined in 44 C.F.R. § 13.3.

16.     The relevant agency that was to be the grantee under the AHPP in Texas was the Texas Department of Housing and Community Affairs ("TDHCA").

17.     DHCA therefore was charged with the responsibility to administer FEMA Grants, including the AHHP grant, and make disbursements of all FEMA grant monies in accordance with the terms of the grant award.

18.     FEMA issued the AHPP *Guidance and Application Kit* on September 15, 2006, the designated agencies of the five Gulf Coast states were given 35 days to develop as many project proposals as they wished to submit by an October 20, 2006, deadline.

19.     The eligible state agencies submitted twenty-nine (29) projects, and FEMA awarded funds to five (5) of these; two projects were awarded to Mississippi and one each to Alabama, Louisiana and, finally, Texas.

20.     The only Texas project which succeeded in being awarded the AHPP grant by FEMA was the project developed with HESTON, a project for which HESTON was to be the vendor providing goods and services.

3

21.     The project awarded to Texas was to produce and test the emergency housing units that HESTON produces, which consist of units of a size equivalent to a standard shipping container. The HESTON emergency housing units are flat packed with support panels, interior trim, electrical and plumbing to a height of approximately two feet. The result is a compact delivery of full size housing/buildings that can be delivered by standard sea freight and waterways, trains, airplanes, helicopters or overland by trailer, without the necessity of support vehicles and the impediments experienced on roadways as a result of height and width limitations. The roof system folds down into the flat pack and is composed of durable granulated asphalt shingle strips that are guaranteed for thirty years and free of penetrations that lower energy efficiency and decrease the possibility of water leakage.

22.     The Texas project with HESTON was to be funded for up to $16,471,725 (85% of a requested $19,378,500). Under full funding of this proposal, 250 units of pre-fabricated, panelized housing would have been constructed.

23.     Having secured the grant, TDHCA, acting through its duly authorized staff, made offers to HESTON, which HESTON accepted, to supply the emergency housing units of its emergency housing in turn for disbursements funded by the AHPP grant., as governed by the terms of that grant.

24.     Pursuant to the terms of FEMA's grant under the AHPP, on April 1, 2008, HESTON entered into a contract with TDHCA, hereinafter referred to as the "AHPP Grant Contract" or, simply, the "Contract."

25.     HESTON then began to perform the work under the Contract, providing goods and services and incurring costs.

26.     Throughout the course of the Contract, HESTON substantially met or exceeded all requirements of the Alternative Housing Pilot Program (AHPP) which the Contract imposed on it, and acted honestly and in good faith, accepting instruction, guidance, and orders from TDHCA communicated to it by TDHCA staff.

27.     Throughout the course of the Contract, HESTON expended time, money, effort, credit, property and resources to meet its contractual obligations to provide the emergency housing for which TDHCA had contracted to meet the terms of the AHPP Grant.

28.     Despite HESTON's satisfactory contractual performance, TDHCA's senior staff, in particular Gerber, Rivera, Callan and Irvine, (collectively, "Headquarters Staff") developed an animus toward HESTON and attempted to obstruct its performance and, ultimately, refused to comply with TDHCA's own contractual obligations, as described below.

29.     The animus against HESTON began on or around the time in which the Honorable Sheila Jackson Lee, a member of the United States House of Representatives representing the Eighteenth Congressional District and a member of the Committee on Homeland Security, began to participate in Congressional investigations of TDHCA's performance administering Federal Funding such as FEMA grants, including the AHPP grant.

30.     In 2008, Rep. Lee acting in her role as a member of Congress representing a district likely to be affected by any FEMA emergency housing programs, came to suspect and believe that TDHCA appeared to be delinquent in a number of material instances in fulfilling its responsibility to administer the AHPP grant.

31.     Rep. Lee learned during this time that an audit of TDHCA's administration of a federal funds FEMA allocated to TDHCA for certain specific projects including Federal Disaster Relief was inefficient, not functioning as intended, not functioning as desired, and wasteful.

32.     Rep. Lee learned that this audit concluded that less than five (5) % of the funds intended to finance the core public purposes identified by the United States Congress were in fact being used to finance those public purposes.

33.     Rep. Lee therefore began official inquiries, acting in her role as member of Congress, concerning TDHCA administration of Federal / FEMA funds to determine if that administration exhibited fraud, waste, and abuse.

34.     Therefore, in 2008, Rep. Lee initiated a public hearing before the House of Representatives' Committee on Homeland Security to investigate TDHCA's administration of FEMA funds, at which hearing that Committee took testimony from, among others, defendant Gerber.

35.     At those hearings, Rep. Lee was highly critical of TDHCA.

36.     Defendant Gerber believed that Rep. Lee's adverse views of TDHCA arose in whole or in part from information the Congresswoman received from HESTON.

37.     Soon after HESTON received the contract award, Gerber began to express his anger and animus toward HESTON, based on Gerber's belief that Rep. Lee received negative information from HESTON.

38.     Gerber expressed this animus directly to HESTON's chief executive officer on a number of occasions, beginning in September 2008, shortly after the Contract was awarded to HESTON.

39.     Thereafter, Gerber and other TDHCA Headquarters Staff instructed HESTON's chief executive officer and others working for HESTON to refrain from discussing, communicating, answering questions about, or speaking of TDHCA to any third parties, including Rep. Lee and also the media, local and county public agencies, federal government agencies, and federally elected officials, and others.

40.     After Gerber and other Headquarters Staff came to believe that HESTON had not obeyed its unlawful instruction not to speak to anyone about TDHCA, Gerber and other Headquarters Staff began a campaign of retaliation against HESTON.

41.     TDHCA's field staff reported to defendants Gerber, Rivera, Callan and Irvine, (collectively, "Headquarters Staff") that HESTON complied with the instructions and directions, clarification, direction, that the field staff issued.

42.     TDHCA's field staff also reported to Headquarters Staff that HESTON was performing its obligations under the Contract in a satisfactory fashion.

43. Despite this information, TDHCA Headquarters Staff contrived to create and to perpetuate the knowingly false claim that HESTON was not in compliance with contract requirements and that HESTON refused to so comply.

44. TDHCA's Headquarters Staff required HESTON to undergo multiple, unnecessarily demanding audits, in the apparent hope that some reason could be found to claim HESTON was delinquent in its contractual performance, but HESTON passed all such audits.

45. TDHCA's Headquarters Staff thereafter, on multiple occasions, falsely reported that HESTON had failed in meeting its contractual obligations when, in truth, Headquarters Staff knew from field staff, field reports, and multiple audits that those accusations were false and unsubstantiated.

46. TDHCA's Headquarters Staff thereafter, on multiple occasions, falsely reported that HESTON had failed in meeting its contractual obligations when, in truth, Headquarters Staff knew from field staff, field reports, and multiple audits that those claims were false and unsubstantiated.

47. TDHCA 's Headquarters Staff deliberately ignored the information received from its own field staff, the field reports, and the various audits, in order to make the aforementioned false claims about HESTON's performance.

48. TDHCA's Headquarters Staff made these false claims about HESTON to a number of third parties, including but not limited to local and county public agencies, federal government agencies, persons housed in HESTON units, as well as others.

49. TDHCA's Headquarters Staff made these statements knowing they were false, and knowing they would be harmful to HESTON's business reputation.

50. TDHCA headquarters' staff through a wrongful manipulation of public authority disciplined to a predetermined result and without regard for lawful obligation to the contrary, prevailed upon TDHCA to ultimately refuse to pay HESTON for the work completed under the Contract, instead terminating the Contract on the pretext that HESTON was in default.

51.     The wrongful and unlawful misconduct by TDHCA headquarter's staff caused and continued governmental fraud, waste, and abuse, which said misconduct took forms other than and in addition to those hereinabove outlined, all of which and continues to this date including but not limited to the effort by TDHCA headquarter staff to conceal their misconduct.

## COUNT I – VIOLATION OF 42 U.S.C. § 1983 BY RETALIATION
## AGAINST ON THE RIGHT OF FREE SPEECH BY THE
## HEADQUARTERS STAFF DEFENDANTS IN THEIR PERSONAL CAPACITY

52.     All the previous allegations of this Complaint are incorporated in this Count as if set forth against at length.

53.     At all times relevant to this action, the defendants identified collectively above as the Headquarters Staff at TDHCA, those persons being Michael Gerber, Martin Rivera, Jr., Marisa Callan, and Timothy Irvine, were acting under color of state law while engaged in the acts described above under that section of this Complaint headed "Common Factual Allegations."

54.     The Headquarters Staff were acting under color of state law when they ordered HESTON and its officers and employees, including but not limited to AL-FOUZAN not to speak with Rep. Lee or any others about TDHCA's performance of its duties.

55.     That order violated the First Amendment rights to free speech and the right to petition of HESTON and its officers and employees, rights which are incorporated against the state of Texas by the Fourteenth Amendment.

56.     Such an order attempted to restrict HESTON and its officers and employees, including but not limited to plaintiff AL-FOUZAN in their right to speak on matters of great public importance, including the proper expenditure of millions of dollars of taxpayer funds and the future preparedness of FEMA and the State of Texas for natural disasters and other emergencies.

57.     After giving that unlawful order, the Headquarters Staff defendants began to believe that persons affiliated with HESTON, including but not limited to plaintiff AL-FOUZAN had spoken to Rep. Lee and others about TDHCA anyway.

58.     The Headquarters Staff defendants retaliated against HESTON and AL-FOUZAN based on these beliefs, in the manner described at length above, including falsely representing that HESTON and AL-FOUZAN were delinquent in their contractual performance and in terminating the AHPP Grant Contract.

59.     The Headquarters Defendants have, acting individually and in concert under color or state law, retaliated against HESTON for the exercise of its constitutionally protected right of free speech, thereby violating its First Amendment right as incorporated by the Fourteenth Amendment, and therefore HESTON seeks remedy by and through 42 U.S.C. § 1983.

60.     As a result of the retaliatory actions the Headquarters Staff defendants took against HESTON, HESTON suffered damages in the form of loss of the benefits of the AHPP Grant Contract, damage to its reputation, and a concomitant loss of other government business because the Headquarters Staff defendants wrongfully communicated the false notion that HESTON

WHEREFORE, plaintiffs Heston Emergency Housing LP and Naji Al-Fouzan respectfully demand judgment in their favor for all damages, including consequential damages, against defendants Gerber, Rivera, Callan and Irvine for their actions set forth above, and any other such relief, including but not limited to equitable and declaratory relief to remedy the wrongs done to Heston Emergency Housing LP, and Naji Al-Fouzan as well as attorneys fees and costs.

## COUNT II – DEFAMATION BY THE
## HEADQUARTERS STAFF DEFENDANTS IN THEIR PERSONAL CAPACITY

61.     All the previous allegations of this Complaint are incorporated in this Count as if set forth again at length.

62.     As set forth above, the Headquarters Staff defendants communicated to a wide number of people, including but not limited to local and county public agencies, federal government agencies, persons housed in HESTON units, as well as others, alleged facts about HESTON that were quite damaging to HESTON's reputation.

63.     The content of these communications were materially false.

64.     At the time the Headquarters defendants made these communications, they knew these communications were false.

65.     The aforementioned intentionally false communications were substantially damaging to HESTON.

WHEREFORE, plaintiffs Heston Emergency Housing LP and Naji Al-Fouzan respectfully demand judgment in their favor for all damages, including general and special damages, against defendants Gerber, Rivera, Callan and Irvine for their actions set forth above, and any other such relief, including but not limited to equitable and declaratory relief to remedy the wrongs done to Heston Emergency Housing LP, and Naji Al-Fouzan as well as attorneys fees and costs.

### COUNT III – VIOLATION OF 42 U.S.C. § 1983 BY DEPRIVATION OF DUE PROCESS BY THE HEADQUARTERS STAFF DEFENDANTS IN THEIR PERSONAL CAPACITY

66.     All the previous allegations of this Complaint are incorporated in this Count as if set forth against at length.

67.     At all times relevant to this action, the defendants identified collectively above as the Headquarters Staff at TDHCA, those persons being Michael Gerber, Martin Rivera, Jr., Marisa Callan, and Timothy Irvine, were acting under color of state law while engaged in the acts described above under that section of this Complaint headed "Common Factual Allegations."

68.     The AHPP Grant Contract created a vested property interest for HESTON.

WHEREFORE, plaintiffs Heston Emergency Housing LP and Naji Al-Fouzan respectfully demand judgment in their favor for all damages, including consequential damages, against defendants Gerber, Rivera, Callan and Irvine for their actions set forth above, and any other such relief, including but not limited to equitable and declaratory relief to remedy the wrongs done to Heston Emergency Housing LP, and Naji Al-Fouzan as well as attorneys fees and costs.

## COUNT IV – VIOLATION OF ARTICLE I, SECTION 8 OF THE TEXAS STATE CONSTITUTION BY THE HEADQUARTERS STAFF

69.   All the previous allegations of this Complaint are incorporated in this Count as if set forth again at length.

70.   Article I, Sec. 8. of the Texas State Constitution states, in relevant part, "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."

71.   The Headquarters Defendants at TDHCA, Michael Gerber, Martin Rivera, Jr., Marisa Callan, and Timothy Irvine, were acting under color of state law and by way of their authority under state law when, as set forth more fully above, they interfered with the right of HESTON, its officers and employees and to speak freely on any subject, using the power of state law to curtail the liberty of speech by, first, using their authority under state law to order that speech be curtailed and by, second, using their authority under state law to retaliate against HESTON because they believed HESTON, its officers and employees, exercised their protected liberty of speech.

72.   Plaintiffs demand a trial by jury and tender their jury fee.

WHEREFORE, plaintiffs Heston Emergency Housing LP and Naji Al-Fouzan respectfully demand judgment in their favor for all damages, including consequential damages, against defendants Gerber, Rivera, Callan and Irvine for their actions set forth above, and any

other such relief, including but not limited to equitable and declaratory relief to remedy the wrongs done to Heston Emergency Housing LP and Naji Al-Fouzan as well as attorneys fees and costs.

RESPECTFULLY SUBMITTED,

KATINE & NECHMAN LLP

By: _____

MITCHELL KATINE
State Bar No. 11106600/ Fed ID # 7700
1111 North Loop West, Suite 180
Houston, Texas 77008-1700
Telephone: (713) 808-1001 (direct line)
Telecopier: (713) 808-1107
mkatine@lawkn.com

ATTORNEYS FOR PLAINTIFF


OF COUNSEL:

LAW OFFICE OF DENNIS A. DURKIN
DENNIS A. DURKIN
P.O. BOX 88
ROSELAND, NEW JERSEY 07068
Telephone: (973) 228-1490
Telecopier: (973) 228-7029
DADURKIN@aol.com